UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

**MELISSA PEDDIE,**                    **CASE NO. 5:22-cv-00149-MW-MJF**

    **Plaintiff,**

v.

**CALHOUN-LIBERTY HOSPITAL ASSOCIATION, INC. d/b/a CALHOUN-LIBERTY HOSPITAL,**

    **Defendant.**
_____/

## SECOND AMENDED COMPLAINT

Plaintiff, MELISSA PEDDIE, hereby sues Defendant, CALHOUN-LIBERTY HOSPITAL ASSOCIATION, INC. d/b/a CALHOUN-LIBERTY HOSPITAL, and alleges:

### JURISDICTION

1. This is an action brought under Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §2000e et seq. and under 42 U.S.C. §1981a. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights claim jurisdiction).

2. This is an action involving claims which are, individually, in excess of Seventy- Five Thousand Dollars.

### THE PARTIES

3. At all times pertinent hereto, Plaintiff, MELISSA PEDDIE, has been a resident of the State of Florida and was previously employed by Defendant. Plaintiff is a member of a protected class because she reported unlawful employment practices and has been retaliated against thereafter.

4. At all times pertinent hereto, Defendant, CALHOUN-LIBERTY HOSPITAL ASSOCIATION, INC. dba CALHOUN-LIBERTY HOSPITAL, has been organized and existing under the laws of the United States. At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above. Defendant is Plaintiff's previous employer as it relates to these claims.

## CONDITIONS PRECEDENT

5. Plaintiff has satisfied all conditions precedent to bringing this action.

## STATEMENT OF THE FACTS

6. Plaintiff initially worked for the Defendant between 2007 until 2009 as an ER Technician, and then again from May 2016 until October 2016 as an Interim Emergency Medical Services Director.

7. Plaintiff is a former employee of Defendant and currently works as an EMS Director/Paramedic with Liberty County Board of County Commissioners in Liberty County, Florida.

8. Plaintiff has been and continues to be subjected to disparate treatment, different terms and conditions of employment, and held to a different standard because of her prior discrimination claims against Defendant and has been the victim of retaliation thereafter.

9. The retaliation came at the hands of specifically but not limited to Defendant's Board of Directors Chair Mark Plummer ("Plummer"), Dr. Murray Baker, Sr. ("Baker"), Dr. Emmanuel Tanglao ("Tanglao") and Risk Manager Janna Matautia.

### *Relevant Background*

10. Plaintiff filed a lawsuit against Defendant in or around 2009 for gender discrimination which settled in 2010. Plaintiff refused to agree to any effort by the Defendant to prevent her from working for the Defendant after the resolution of her lawsuit.

11. From 2010 until May, 2016. Plaintiff did not work for the Defendant Hospital. She was the Director of Emergency Medical Services and a working paramedic for Liberty County for the entirety of this time period. She transported patients to and from the Defendant Hospital and had ongoing problems during that time with Defendant's Emergency Room (ER) staff.

12. Specifically, between the time that she settled her case in 2010 until May 2016, there were constant problems with Plaintiff bringing patients to the

Defendant Hospital to the point that the Plaintiff's employer, Liberty County, had to get involved and had a meeting with the Defendant's Board to stop the harassment of the Plaintiff.

13.  By way of example, during the 2010 to May 2016 time period, Plaintiff was falsely criticized on a weekly basis by the Defendant Hospital's ER staff for not doing her job.  She was criticized by ER staff frequently for bringing patients to Defendant's Hospital stating that she should have taken the patients elsewhere and for not giving proper care to patients.  She was routinely shunned when she brought patients to the Defendant's ER and staff with the ER walked aways from her when she tried to talk to them about patients' conditions.

14.  During this time period, Plaintiff was also mocked on a routine basis for providing the proper medical care with statements like "at least you didn't do this" to the patient, many times in front of patients for whom Plaintiff was providing care.

15.  Over this six year period, Plaintiff even heard criticisms of her patient care from emergency medical service (EMS) personnel who previously worked for the Defendant Hospital.  A friend of Plaintiff who works in the EMS field in Jackson County also told her that Defendant Hospital staff talk negatively about Plaintiff's care and treatment of patients, none of which was true.

16.  Although the ER staff changed over time, the Hospital Board did not and remained mostly the same from the time that she was previously employed from 2007 through 2009 up through the present, other than several changes recently around 2022.

17.  Plaintiff continued to work in what was an extremely hostile environment from 2010 until May 2016.

18.  In or about May 2016, Defendant's newly hired Risk Manager Cynthia Pettis ("Pettis") asked Plaintiff if she would be willing to take the position of Interim Emergency Medical Services (EMS) Director with Defendant. Cynthia Pettis was a fairly new employee at Defendant, having worked for Defendant for around two months, when she talked to Plaintiff about the Interim EMS Director position with the Defendant.

19.  Plaintiff interviewed and was hired by Defendant's CEO James Heitzenrater in May 2016, who was a new CEO for Defendant, having been with Defendant for a few months as of May, 2016.

20.  Plaintiff applied for this position notwithstanding the hostility she experienced during the time period from 2010 to May 2016 because it was a significant pay additive for Plaintiff ($2,700 per month in addition to what she was then making) and she wanted to show that she could do the job even with the criticisms of her performance. She wanted the job to work the problems out with

5

the Defendant and thought that getting the EMS Director position would be a chance for the Hospital staff to see that she was a good, competent practitioner.

21.     However, Plaintiff was hired by Pettis and Heitzenrater without the knowledge of the Defendant's Board.  Neither Pettis or Neitzenrater were involved in Plaintiff's past lawsuit or settlement thereof but most if not all of Defendant's Board members in 2016 were the same Board members who were on the Board when Defendant was sued in 2009 and settled in 2010.

22.     Defendant's Board in 2016 was also aware of Plaintiff's prior lawsuit and one or more of the Board members were involved in either the lawsuit or the resolution thereof in the 2010 time period.

23.     In or around July 2016, Defendant's employees Marilyn Russell and Ruth Attaway told Pettis to get rid of Plaintiff because she had sued them seven (7) years prior.  Russell and Attaway were members of the Board in the 2009/10, as well as the 2016, time period.

24.     Thereafter, after Plaintiff had been in the Interim Director position for around five months, and despite Plaintiff's stellar work performance in that position, she was told in October 2016 by Pettis and Neitzenrater that they had been told by the Board that Plaintiff could not be hired into the permanent position because of her prior lawsuit.

25. Instead, Defendant hired Keith Maddox ("Maddox"), who was less qualified than Plaintiff for the Director position, and paid him twice the amount it paid Plaintiff. Despite Plaintiff offering to stay at a lesser salary than Maddox, Defendant denied Plaintiff the permanent EMS Director position on or around October 2016 in retaliation for her reporting of gender discrimination and subsequent lawsuit which was settled in 2010.

26. During the time that Plaintiff was in the Interim EMS Director position, Plaintiff was protected by Pettis and Neitzenrater but she still had difficulty performing her job duties. By way of example, there were ER staff who refused to take direction from Plaintiff and actually flaunted her authority. There were staff who would not speak to Plaintiff during this time and she was intentionally excluded from meetings. Certain employees, when they came into contact with Plaintiff, turned the other way and were defiant towards Plaintiff when she told them what to do.

### *Facts Pertaining to the Current Cause of Action*

27. Plaintiff was, and continues to be, employed by Liberty County as the Director of EMS/Paramedic.

28. After being denied the EMS Director position, the hostility against Plaintiff actually increased.

29. Between November, 2016 and the present, Defendant has tried multiple times to have Plaintiff's paramedic license taken from her. Almost every time that Plaintiff took a patient to the Defendant, she was faced with resistance and criticism. The ER staff have been rude to her and when she talks to them, they walked off. She continues to be criticized for patient care and false allegations have been made that she has failed to properly care for her patients.

30. Dr. Mary Watson worked for the Defendant and told her in about the 2019 time period that she needed to watch her back.

31. Later, in the 2021 time period, as an illustration of the retaliation against Plaintiff, Dr. Watson, who worked for the Defendant from September 2016 through January 2020, wrote the following about her observations of the events that were occurring regarding Plaintiff:

> On August 18, 2019 Liberty County EMS brought a patient to Calhoun Liberty ER for evaluation after crashed a vehicle he was driving head on into a tree with air bag deployment and was unrestrained. Patient was alert and oriented on the scene of the accident per EMS reports and initially refused any medical treatment or transport. Liberty EMS were able to counsel the patient to be transported to a medical facility for evaluation and patient would only agree to be transported to the Calhoun Liberty ER. As he was alert and oriented and vocalized his understanding that he could have serious acute internal injuries which may require medical treatment which Calhoun Liberty would not be able to provide, and patient still insisted he would not be seen anywhere else he was transported to our facility. Patient subsequently was found to have injuries from his collision which required transfer to an outside hospital which did have the capabilities to adequately treat his injuries. As Calhoun Liberty is a critical access hospital the risk manager and CNO – Esther Stoltzfus and Janna Matautia felt the patient should not have been

brought to our ER as he was a trauma which critical access hospitals do not have the capabilities to manage. However, as the patient had capacity at the time of his requests to only be transported to CLH and we have accepted, evaluated and transferred out other trauma patients and patients which our facility did not have the ability to adequately treat and manage I did not feel this was an issue which met the requirements to report to the state EMS agency for complaint. As the acting Emergency Department Director, I was asked by Ms. Stoltzfus to file a complaint with the state EMS Agency for negligence so "Melissa Peddie's license can finally be taken away" -I advised her at the time of her request I did not feel it would be appropriate to submit such a complaint especially as Melissa was not one of the medics who brought this patient to our ER for evaluation. Ms. Stoltzfus was clearly displeased with my refusal of her request, and it was after that refusal when I began to experience hostility, slander, discrimination and ultimately termination based off entirely false and unsubstantiated accusations. For the six years I worked at CLH the animosity towards Ms. Peddie demonstrated by the hospital staff and administration was an unfounded and continuous hunt to have her license revoked from the state.

32. The actions against the Defendant against Plaintiff have been incessant and have affected her emotionally on a weekly if not daily basis.

33. As examples of the harm that the Defendant has tried to cause for Plaintiff, and consistent with Dr. Watson's observations, on or about July 16, 2020, Plaintiff was the on-duty driver during a medical call for a critical care patient. The charge medic, a paramedic, and an R.N. were in the back of the ambulance with the patient when they arrived at Plaintiff's former employer, Defendant, for care and treatment of the patient.

34. Upon arrival at Defendant's facility, the receiving doctor, Dr. Tanglao, walked slowly back to the truck. The charge medic had been performing chest

9

compressions on the patient who was not stable. The doctor asked why the patient was not intubated, to which the charge medic responded that it was not protocol to intubate the patient. Dr. Tanglao told the charge medic to stop all revival attempts. With the patient's family watching, the ER doctor and staff refused to touch or provide care to the patient. The doctor walked back inside the hospital and sent staff back out to place a sheet over the patient and had the charge medic, paramedic, and R.N. roll the patient into the hospital.

35. In contrast to the patient care that Plaintiff provided, the ER doctor and staff did not provide proper patient care. They should have done more for the patient; at the very least they should have examined the patient and performed chest compressions but no actions were taken against the doctor or staff for their substandard care. Although Plaintiff has been falsely criticized for her patient case and efforts to have her license taken, Dr. Tanglao failed or refused to render lifesaving care to a patient brought by Plaintiff and others for care.

36. Dr. Baker, the Defendant's Medical Director who replaced Dr. Watson, called Plaintiff's Supervisor with Liberty County, Medical Director Dr. Carol Sutton ("Sutton") and stated that Sutton should fire Plaintiff. Defendant, through Dr. Baker, told Dr. Sutton that Plaintiff was going to lose her paramedic license. Dr. Baker also told Dr. Sutton that Plaintiff would cause her to be in the middle of a lawsuit.

10

37. Around this same time period, Plummer, the Chairman of the Defendant Hospital's Board of Directors, then contacted Plaintiff's employer, the Liberty County Board Commission, specifically Commissioner Jim Johnson ("Johnson"), to falsely tell him that Plaintiff was at fault for a patient dying (in reference to the incident mentioned above in paragraph 34 above), and that she would cause Liberty County to be at risk of a lawsuit.

38. Plummer was on the Defendant's Board in 2009 and 2010 at the time Plaintiff filed her earlier lawsuit and would have been aware of that suit and the settlement thereof.

39. Plaintiff maintains that Plummer's contact of her employer as set forth in paragraph 37 above, constitutes retaliation for filing her earlier lawsuit.

40. Defendant continued in its retaliation against Plaintiff when it filed an unfounded complaint against her on or around August 2020 with the Florida Department of Health (DOH), Emergency Medical Services (EMS), in an attempt to have Plaintiff's license revoked.

41. Both Plummer and Baker were involved in initiating this complaint against Plaintiff with EMS although Baker signed the complaint.

42. This unfounded complaint was suspect for several reasons: (1) the physician who reported the complaint (Baker) was not present at the time that Plaintiff committed the alleged lack of care; (2) Baker was also the doctor who called

11

Plaintiff's supervisor, Dr. Sutton, in an attempt to have her fired; (3) Plaintiff was the driver at the time of the incident, and was not in the back of the ambulance with the patient; (4) the charge medic, not Plaintiff, made the final call on patient care; (5) Defendant, through Dr. Baker or any other employee, did not make a complaint against the charge medic; and (6) Defendant did not make a complaint against the paramedic or R.N. who were also in the ambulance during the incident described in paragraph 20 above.

43. In September 2020, Defendant, through Dr. Baker with the involvement of Plummer, as the Chairman of the Board of the Defendant, continued in its retaliation against Plaintiff when it filed another unfounded complaint against her with the Florida DOH, EMS, in another attempt to have Plaintiff's license revoked.

44. This unfounded complaint was suspect because, once again, (1) Plaintiff was the driver at the time of the incident, and was not in the back of the ambulance with the patient; (2) the charge medic makes the final calls on patient care, not the driver; and (3) Defendant did not make a complaint against the charge medic.

45. Plaintiff was placed under investigation by the Bureau of EMS Probable Cause Board effective immediately for the July 2020 incident. Plaintiff was not placed under any restrictions but remained under investigation for over eight (8)

months which seriously affected her mental health as she was in grave fear daily of losing her license.

46. These complaints in July and September 2020 had an adverse effect on Plaintiff's ability to perform her job duties in that she was emotionally crippled. She is the primary provider for her family and worried every day about whether she was going to lose her license based on a lie.

47. Prior to Defendant's retaliatory actions, Plaintiff had never had a complaint lodged against her with DOH or EMS in her twenty-plus year career as an EMT (she has been an EMT since 1998) or Paramedic (she has been a paramedic since 2001).

48. In or around October 2020, at Defendant Hospital's new groundbreaking ceremony, Defendant's Board of Directors Chairman Plummer, discussed the possibility of Defendant taking over Liberty County's EMS Services with Liberty County Board Commissioner Brown and Clerk of Court Kathy Brown. Plummer asked Kathy Brown to put the Liberty-Calhoun EMS takeover on the agenda for the Liberty County Board of County Commissioners November 2020 meeting.

49. Plummer knew at that time that Plaintiff was under investigation due to complaints made through his involvement and by a member of the Defendant's staff, Dr. Baker.

13

50. He also was well aware of the position that Plaintiff was in with Liberty County, i.e., the Director of EMS and working paramedic, and that this takeover would mean that she would be under the Defendant Hospital's control, if she had been rehired, which was doubtful in light of the actions above.

51. This posed a risk to Plaintiff as Defendant has a vendetta against her (as described by Defendant's retaliatory actions above), and she was afraid that her current job was in jeopardy.

52. Plummer also talked about Plaintiff with Brown during this same conversation referenced in paragraph 48 above, and upon information and belief, continued to falsely claim that Plaintiff was responsible for a patient's death, which incident is described in paragraph 34 above. This was Defendant's way of continuing the retaliation against her through her current employer, specifically through Liberty County Board Commissioner Brown.

53. After this conversation between Plummer and Brown, Brown's interactions involving Plaintiff changed and there were multiple problems in their interactions that had not existed before.

54. After his conversation with Plummer, Liberty County Board Commissioner Brown was in support of Defendant's takeover, based on the allegations against her by Defendant and its employees/agents, and began specifically targeting Plaintiff by making false allegations against her. She was

continually having to defend against his false claims which adversely affected her ability to perform her job.

55. By May 2021, Plaintiff was no longer under investigation by the Bureau of EMS Probable Cause Board as the Bureau found the complaints against Plaintiff to be unfounded.

56. In late 2021, Defendant merged with Tallahassee Memorial Hospital and is now in the TMH network, however, Plaintiff is in constant fear for her job despite having two (2) years until retirement due to Defendant's retaliatory actions.

57. There are still efforts being made by Plummer, who is still Chairman of the Defendant's Board, to take over Liberty County EMS.

58. Defendant's actions have caused Plaintiff extreme stress and tension, and has affected, and continues to affect, her relationship with her current employer and her family.

59. Plaintiff has retained the undersigned to represent her interests in this cause and is obligated to pay a fee for these services.  Defendant should be made to pay said fee under the statutes referenced above.

## COUNT I
## RETALIATION

60. Paragraphs 1 through 59 are re-alleged incorporated herein by reference.

61. This is an action against Defendant for unlawful retaliation after Plaintiff reported unlawful employment practices adversely affecting her under 42 U.S.C. § 2000e et seq. and 42 U.S.C. § 1981a.

62. Defendant is an employer as that term is used under the applicable statutes referenced above.

63. The foregoing unlawful actions by Defendant were purposeful.

64. Plaintiff voiced opposition to unlawful employment practices during her employment with Defendant and has been the victim of continuous retaliation thereafter.

65. The events set forth herein have led, at least in part, to adverse actions against Plaintiff as set forth above.

66. Plaintiff is a member of a protected class because she reported unlawful employment practices and has been the victim of retaliation thereafter. There is thus a causal connection between the reporting of the unlawful employment practices and the adverse employment action taken thereafter.

67. As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiff has suffered mental anguish, emotional distress, expense, loss of benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, lost opportunities, loss of capacity for the enjoyment of life, and other tangible and

intangible damages. These damages are continuing and are permanent. Plaintiff is entitled to injunctive/equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant for the following:

    (a)    that process issue and this Court take jurisdiction over this case;

    (b)    that this Court grant equitable relief against Defendant under the applicable counts set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

    (c)    enter judgment against Defendant and for Plaintiff awarding all legally-available general and compensatory damages and economic loss to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

    (d)    enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein;

    (e)    enter judgment against Defendant and for Plaintiff awarding Plaintiff attorney's fees and costs;

    (f)    award Plaintiff interest where appropriate; and

(g) grant such other further relief as being just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

Respectfully submitted,

/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P.A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone: (850) 383-4800
Facsimile: (850) 383-4801

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished on all counsel of record through CM/ECF this 8th day of February 2023.

/s/ Marie A. Mattox
Marie A. Mattox